UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| WIL JACKSON, ) | |
| ) | |
| Plaintiff, ) | Civil No. 5:16-cv-452-JMH |
| ) | |
| v. ) | |
| ) | |
| AULICK CHEMICAL SOLUTIONS, INC., ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendants. ) | |
| ) | |

\*\*\*\*\*

This case is before the Court on Defendant's Motion for Summary Judgment [DE 15]. For the reasons stated herein, Defendant's motion will be denied.

**I.   FACTUAL BACKGROUND**

This case presents an ironic story: a company outing meant to boost morale and teamwork resulted in an injury that, in Plaintiff's view, ultimately led to his termination and this acrimonious lawsuit.

The parties agree on very few of the facts which underlie this action. Wil Jackson, an engineer now age 72, began working for Defendant Aulick Chemical Solutions, Inc. (ACS) in January 2010. ACS is a manufacturer of water and wastewater treatment chemicals and industrial compounds. Jackson was hired on as a sales and customer representative working out of his home in

Tennessee.  In February 2016, Tim Aulick, owner of ACS, informed Jackson he would be reassigned to a research and development engineering position.  The base pay and benefits were equal, but unlike the sales position, the engineering position did not bring with it the promise of commission, which was as much as $10,000 or more per year. It is not surprising, then, that Jackson viewed this as a less desirable position.  Throughout his employment with ACS, Jackson maintained a work-journal of sorts that the parties refer to as his "daily log."  This daily log was something Jackson kept for his personal use and detailed Jackson's services, business communications, business travel, and more.  The daily log was not required by ACS or turned in for purposes of billing or pay.  Jackson's daily log heavily implies that he maintained it, at least in part, for what is often referred to in the vernacular as "CYA" ("Cover Your Ass").[1]  For example, Jackson's daily log repeatedly contained the heading: "FOR MY RECORDS AND JUSTIFICATION IF & AS NEEDED."  (DE 15, Ex. B, Daily Logs).

On June 23, 2016, Jackson fell at the company team-building retreat.  Jackson asserts he injured his hip at this event, an assertion Defendant questions.  However, for purposes of this motion, the Court assumes Jackson's allegations of his injury and

---

[1] One can imagine many other reasons Jackson kept such a log: travel tax deductions, client service records, and ensuring prompt responses to communications, just to name a few.  The Court notes that Jackson appears to keep them for "CYA" purposes because it suggests Jackson anticipated future problems with ACS or even, possibly, litigation.

treatment are true and were caused by the fall, as there are several instances in the record indicating that he was injured or complained of pain in the days following the fall. (DE 15, Ex. B, p. 25; Ex. A, Depo. of Wil Jackson, p. 58 – 63; 72).

On July 17, 2016, Jackson sought medical treatment for pain at the emergency room. He was given prescription-strength Ibuprofen and discharged. He took two days off work, during which he had a pleasant email exchange with Troy Taubert (head of chemical sales and technologies at ACS) and Aulick about his situation, filing a workers' compensation claim, and his need for time off.

Aulick believed the treatment to be minor and therefore requested that Jackson forward the medical bills to ACS for payment directly, rather than filing a workers' compensation claim. Jackson, however, recalls Aulick pressuring him not to file a workers' compensation claim, and states Aulick warned Jackson he "would regret this" if he went forward with filing a workers' compensation claim. (DE 15, Ex. A, Depo. of Wil Jackson, p. 58 – 63; 72).

On August 1, 2016, Taubert informed Jackson that he was terminated. ACS gave Jackson six weeks' severance pay. The reason for this termination is the crux of the dispute between the parties. Jackson contends he was fired for filing a workers' compensation claim; ACS contends he was fired for poor job

performance (specifically, for the loss of the CUB client in Jackson's territory), economic hardship which resulted from that poor job performance, and/or because he was "unwilling to work with them on their plan to transition him to a new position." (DE 15, Mem. in Supp. of Mot. for Summ. J., pg. 20).

## II. JURISDICTION AND STANDARD

### *A. Applicable Law*

Although not raised by the parties, the Court must set out its basis for subject matter jurisdiction in this case. Plaintiff filed this case in federal court originally (not removed to federal court) pursuant to diversity jurisdiction and alleges only one cause of action: violation of the Kentucky Workers' Compensation Act. Jurisdiction is not challenged by Defendant and is found under 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy is met as established during a hearing be Magistrate Judge Wier. (DE 12).

Federal courts sitting in diversity apply federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). The substantive law of the forum state governs the claims asserted. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439 (6th Cir. 1993). Accordingly, the Court will evaluate the Motions in accordance with the Federal Rules of Civil Procedure while applying substantive Kentucky law to the underlying claim.

Plaintiff brings a single cause of action pursuant to the KWCA. The Act provides that no "employee shall be harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful claim" for workers' compensation benefits. KRS 342.197(1).

Kentucky courts apply a modified version of the familiar *McDonnell-Douglas* burden-shifting scheme to retaliation claims. *Ky. Ctr. For Arts v. Handley*, 827 S.W.2d 697, 701 (Ky. App. 1991); *Chavez v. Dakkota Integrated Sys., LLC*, 2011 WL 2148373 at *13 (W.D.Ky. May 31, 2011); *Hodge v. Dollar General*, 2011 WL 3880486 at *8 (E.D.Ky. Aug. 29, 2011). A plaintiff can establish a *prima facie* case of workers' compensation retaliation through "proof that: (1) he engaged in a protected activity; (2) the defendant knew that the plaintiff had done so; (3) adverse employment action was taken; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915-17 (Ky. App. 2006). "The fourth element of the test requires the employee to demonstrate that her engagement in a protected activity was a substantial and motivating factor but for which the employee would not have been discharged." *Chavez v. Dakkota Integrated Sys., LLC*, 832 F.Supp.2d 786, 800-01 (W.D.Ky. 2011)(quotation marks and citation omitted).

Upon the plaintiff proving a *prima facie* case for workers' compensation retaliation, the burden shifts to the defendant "to

5

show a non-retaliatory reason for the adverse employment decision." *Dollar Gen. Partners* at 16. If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for the unlawful retaliation. *Id.*

### B. *Standard of Review*

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.*

Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

**III. ANALYSIS**

Defendant puts forth three arguments: first, that Jackson fails to establish a causal connection between the protected activity and the termination, thus failing to prove a *prima facie* case of retaliation. Second, Defendant argues that even if the Court finds Jackson proved his *prima facie* case, ACS has articulated multiple legitimate, non-retaliatory reasons for terminating him. Finally, Defendant asserts Plaintiff cannot show that the proffered reasons for the firing were pretextual, largely because Plaintiff does not dispute that ACS lost a large client in Plaintiff's sales territory and that he received an offer to work as an engineer.

Defendant does not dispute that Plaintiff has proven the first three elements of a *prima facie* case of workers' compensation retaliation. The Court disagrees with Defendant, however, and holds that Plaintiff has also proven the fourth element, a causal connection.

The undisputed timeline of events in this case is that ACS lost CUB as a client at some point in 2016[2], that ACS management discussed with Jackson moving him to an engineering role in February 2016, with a transition to occur over the next few months or year, that on July 12, 2016, ACS management and Jackson had a

---

[2] There is disagreement the record as to whether ACS lost CUB as a customer in "early 2016" or "summer time" or just days before Jackson's termination.

7

cordial exchange about the upcoming transition, that ACS learned of the workers' compensation claim on July 17, 2016, and ACE terminated Jackson on August 1, 2016. In the July 12, 2016, email exchange, Taubert attached a job description of the new position, asked Jackson to contact him with any questions, wished him happy birthday, and told Jackson he was "excited" to "explore bringing new solutions to environmental problems" with Jackson. Nothing in this email exchange even remotely suggests that Jackson's job was in jeopardy or that the new position was contingent upon Jackson accepting the position, or upon accepting the position in writing within a certain timeframe, or upon his sales performance and customer retention in July 2016. ACS learned of the workers' compensation claim five days after this affable, upbeat email exchange, and 15 days later, terminated Jackson.

The facts of this case demonstrate arguably a close temporal proximity which alone may raise the inference that Jackson was fired due to his protected activity:

> Circumstantial evidence of a causal connection is evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action . . . In most cases, this requires proof that (1) the decision-maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action. But a close temporal proximity alone may be sufficient to raise the

inference.

*Kentucky Dept. of Corrections v. McCullough*, 123 S.W.3d 130, 135 (Ky. 2003)(internal quotation marks and citations omitted). Fifteen days is sufficiently close temporal relationship to prove a causal connection. *See Dollar General Partners v. Upchurch*, 214 S.W.3d 910, 916 (Ky. App., 2006) (five months was sufficiently close in time). Furthermore, Jackson testified that Aulick told him on July 27, 2016, that he "would regret" filing a workers' compensation claim, supporting his claim that the workers' compensation claim resulted in his termination a few days later.

ACS has provided several neutral, non-retaliatory reasons for terminating Jackson on August 1, 2016. ACS claims it fired Jackson on August 1, 2016, because: (1) of poor sales performance[3]; (2) Jackson did not accept the engineering job position[4], (3) ACS lost CUB, one of Jackson's service customers[5]; and (4) of economic hardship requiring a reduction in workforce[6]. Although these reasons are non-retaliatory, they are insufficient to warrant summary judgment in light of the facts in the record supporting Plaintiff's claims of pretext.

---

[3] DE 16, Ex. 3, Depo. of Tim Aulick, p. 55; DE 16, Ex. 6, Depo. of Troy Taubert, p. 35; DE 15, Mem. in Sup. of Motion for Summ. J., p. 16-17.
[4] DE 16, Ex. 3, Depo. of Tim Aulick, p. 55; DE 16, Ex. 6, Depo. of Troy Taubert, p. 35; DE 15, Mem. in Sup. of Motion for Summ. J., p. 17
[5] DE 16, Ex. 3, Depo. of Tim Aulick, p. 55; DE 16, Ex. 6, Depo. of Troy Taubert, p. 35
[6] DE 15, Mem. in Sup. of Mot. for Summ. J., p. 15.

Plaintiff has presented enough evidence to convince this Court that the proffered reasons are very likely pretextual, and that there are sufficient disputes as to the material facts of this case to defeat the summary judgment motion. In fact, some of Defendant's proffered reasons are flimsy, even nonsensical. Taking each in turn:

**(1) Poor sales performance**

It does appear ACS had concerns with Jackson's sales performance for at least six months preceding the termination, which is why ACS planned for Jackson to transition to a non-sales, engineering position. However, ACS offers absolutely no explanation as to why "poor sales performance" supports firing Jackson on August 1, 2017, when Taubert and Aulick had apparently been planning to address this concern by transitioning Jackson to a non-sales position since February 2016. Taubert wrote Jackson a very positive email expressing how "excited" Taubert was over the new role Jackson was to have in the company on July 12, 2016. Plaintiff has presented a genuine issue of fact as to whether this reason for the termination is pretextual.

**(2) Jackson did not accept the engineering position**

This proffered reason for Jackson's termination defies logic and common sense viewed in light of the evidence in the record. The July 12, 2016, email correspondence ACS relies on to argue

that Jackson "failed to accept a modified job proposal" is as follows:

> Taubert to Jackson, 9:14 a.m.:
>
>> Hey Wil:
>> Please see the attached Job description. I'll be in Knoxville next week and we can discuss any questions you have.
>> Also the office forwarded me a leave request from you. When will you be returning from leave?
>> Thanks.
>
> Jackson to Taubert, 2:23 p.m.:
>
>> Troy,
>> It's just for that Friday [one day]. My birthday is July 17th and my oldest granddaughter's is the 25th. We celebrate both on the same day. That's why Karen and I are going down to Tega Cay on that Friday.
>> Thanks for your consideration. I'm looking forward to our meeting
>
> Taubert to Jackson, 8:53 p.m.:
>
>> Happy early birthday Wil. Have a good time on your day off.
>> Great. Me too. I'm excited we get to explore bringing new solutions to environmental problems.

(DE 15, Ex. 7). A job description detailing the engineering position they previously discussed was an attachment to the email.[7] Taubert testified that a "big" "factor in the dismissal" was that Jackson "never replied to my correspondence accepting that position or not accepting that position[,]" referring to the July

---

[7] Jackson testified that a paper copy of that job description was provided to him prior to his injury as well. (DE 16, Depo. of Wil Jackson, p. 82-83).

11

12, 2016, email exchange quoted in its entirety above. (DE 16, Ex. 6, Depo. of Troy Taubert, p. 16, 19-25). It is clear that Jackson *did* respond to Taubert's email, telling him he was "looking forward" to their meeting, at which Taubert had suggested they "discuss any questions" Jackson had about the job description. It is important to note that this meeting to "discuss any questions" never occurred. When asked whether the July 12 email was the offer to which Taubert expected an "acceptance" in response, Taubert answered that it was "the details of the position." *Id*. at 24. Aulick testified he did not know if an offer was made to Plaintiff. (DE 16, Ex. 3, Depo. of Tim Aulick, p. 36). Oddly, Taubert testified he expected to receive a response to the July 12 email that said Jackson would "accept the position" and "was working on these [research] topics"—research topics which Taubert said he proposed to Jackson in some other, earlier email which was not made part of the record before the Court. (DE 16, Ex. 6, Depo. of Troy Taubert, p. 16, 26-25). Taubert could not recall whether Jackson was ever told his continued employment was conditioned on accepting the offer by taking some affirmative action, such as responding to the email. The best Taubert could explain was that he felt it was "implied" in the July 12 email.

The defense relies heavily on Jackson's lack of a (second) response to the July 12 email as a "failure" or "unwilling[ness]" to accept the new engineering position. (DE 15, Mem. in Supp. of

12

Mot. for Summ. J., p. 18). Defendant also relies on Jackson's testimony that he was not content with the job proposal when he first discussed it with Aulick in May 2016. Jackson testified he was concerned about having to relocate to Nicholasville, Kentucky, from his home in Tennessee, and about the pay cut that ACS proposed, as well as about the complex and dangerous nature of the project on which he was to work. Jackson also testified, however, that he:

> indicated on more than one instance that [the engineering position] was something [he] would look into or consider accepting contingent upon them defining things that [they]'ve already discussed such as how does this facility get built, who is responsible for it, where [does he] actually do this work, who is providing the equipment to do it with, the safety OSHA requirements, the OSHA requirements.

(DE 16, Ex. 1, Depo. of Wil Jackson, p. 115). Based on Jackson's list of questions about the position, Taubert's email that they planned to meet to "discuss any questions," and Jackson's response that he was looking forward to the meeting, a jury could find this reason for the termination was pretextual because no acceptance was anticipated in response to Taubert's email.

### (3) The loss of CUB, a large customer

ACS contends it terminated Jackson because its customer, CUB, decided to take its business to a competitor, and CUB was one of Jackson's service accounts. On its face, this proffered reason is

the most convincing of all of ACS's justifications for firing Jackson; however, there remains sufficient proof that a jury could find this, too, was pretext for a retaliatory firing.

First, the Court notes there is evidence in the record to support Plaintiff's claim that he was not the reason that CUB left ACS and that ACS knew he was not the reason.[8]  Thus, it would make little sense for him to be fired for the loss of that customer.

Second, Taubert and Aulick provide differing accounts of what transpired with the loss of CUB as a customer and how it impacted the decision to fire Plaintiff.  Taubert cited the loss of CUB as the "the focus of why Mr. Jackson was terminated," while Aulick testified he did not know why CUB ceased to be a customer of ACS and that he did not know if it was Plaintiff's fault.(DE 16, Ex. 5, Depo. of Troy Taubert, p. 27; Ex. 2, Depo. of Tim Aulick, pp. 26-28).

Finally, it is a stretch to argue that the loss of CUB was the reason for Plaintiff's termination on August 1, 2016,

---

[8] Plaintiff submitted Affidavits from the employees at CUB with knowledge of the situation, and both said CUB took its business to an ACS competitor for reasons unrelated to Plaintiff. (DE 16, Ex. 7 and Ex. 8, Affs. Of Dan Hawkins and Joe Brock).  Taubert and Aulick knew that in 2016, sometime prior to Plaintiff's injury, CUB bid out the work that ACS typically performed for it, because ACS also bid on the contract.  Taubert said he felt Jackson did not maintain the relationship with CUB well, but he also testified the representative from CUB, Joe Brock, told him CUB was going with another company because of technical issues with ACS's products and was specially not because of anything Jackson had done.  Regardless of whether that was true (as it is hearsay), it casts doubt on Taubert's assertion that he believed Jackson caused the loss of the CUB account and that was the primary reason for the termination. (DE 16, Ex. 5, Depo. of Troy Taubert, pp. 31-35).

coincidentally 15 days after filing a worker's compensation claim. Taubert and Aulick testified CUB bid out the services ACS provided early in 2016; at that time they would have been on notice that CUB was at least considering using another vendor. Taubert also testified he knew that prior to May 2016 there had been "animosity" between CUB and ACS, even as early as sometime in 2015. (DE 16, Ex. 5, Depo. of Troy Taubert, pp. 29-30). Yet, these issues did not warrant firing Plaintiff until August 1, 2016, only coincidentally 15 days after ACS learned of his workers' compensation claim.

The Courts finds that a genuine issue of material fact exists as to whether the loss of CUB as a customer was a legitimate, nonretaliatory reason for terminating Plaintiff, or whether this proffered reason is purely pretextual.

**(4) Economic hardship requiring a reduction in workforce**

Defendant's final proffered reason for terminating Plaintiff is that upon the loss of CUB and otherwise slow sales growth in Plaintiff's territory, it was not economically feasible to continue to employ him. This makes little sense in light of the proposed transition to a non-sales position as early as February 2016. It is possible that ACS's financial position deteriorated throughout 2016 requiring a reduction in the workforce on August 1, 2016. This is dubious, however, because after Plaintiff's termination, ACS filled Jackson's sales position *and* filled the

proposed new engineering position.  A jury could find that this proffered reason was pretext for a retaliatory firing.

IV. CONCLUSION

As stated herein, Plaintiff has presented sufficient evidence of a genuine issue of material fact regarding whether his termination was retaliatory in violation of Kentucky law to survive summary judgment.  Accordingly, Defendant's Motion for Summary Judgment is **DENIED**.

This 5th day of January, 2018.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge